Good morning, Your Honors. May it please the Court, my name is Frank Brugaleri. I'm here on behalf of Appellant Jose Lozano. This case, Your Honor, is about a gentleman who has confirmed bipolar disorder, a very severe and disabling condition. In fact, the ALJ in this case so found, found that he had bipolar disorder, found that that disorder was severe and debilitating. That notwithstanding, the ALJ in this case found that this gentleman could conduct and have gainful employment. He sort of relied on his fact that he was fine when he was on medication, didn't he? I'm sorry, Your Honor? He relied, I think, correct me if I'm wrong, on the fact that although he has bipolar disorder, he can function fairly well if he's on his meds. That is correct, Your Honor. But, Your Honor, the standard we're looking at here is whether or not the four reasons evinced by the ALJ in his decision were specific and legitimate. And as we set forth in our brief, and I think in some quite detail, those bases are, frankly, very flimsy, and it can go through them with the Court. I mean, and to be clear, even though this is a de novo review case, this Court's inquiry is rather constrained. This Court itself has said in the Pinto v. Masonry case that you have to look only at the ALJ's decision, his reasons, his explanations. His explanation, as Judge Fischer said, seemed to revolve around the fact, if you look at the detailed history of this case, this fellow has been diagnosed with bipolar, and he has these episodes. It seems as though that he went to the Mexican hospital where he was off his meds and they said he was drinking. They get him dried out, they get him straightened out, back on his meds, and he's fine. He goes out. Every time it seems to me, and I'm just talking about what I read, as you said, from the IJ, it seems as though he has his episodes relative to the bipolar, which we admit he has, which they admit he has been diagnosed many, many times. So they either adjust the meds and get him out, or they adjust the meds, he gets out, and he's sleepy, so they bring him back and adjust again. But it's always adjusting the meds. And it seems as though after the process of the actual process of the medical people, psychiatrists getting the meds, he's out okay. But then it's the opinions that they give after those things. But I don't see where he ever went to an institution, clinic or whatever. He's at the Tulare Clinic for several years or something. They always, quote, fixed him with the meds. Now, am I misinterpreting that? Well, your Honor, I think you're correct. I mean, I think what hopefully you're missing is that that is the nature of this disease. It's a variable disease. It's an insidious disease. But we're talking now, that's medical side. On the disability side, we're talking about what the law provides. And even though you have a disease, you may not be disabled for the purposes of Social Security. That's what we're trying to sort out here. Understood, your Honor. I find there is an issue, though, that because he has to use meds in order to survive, that he did have the side effects. And that seems to be an issue of where they're going and what do these side effects do from the fact that you take the meds, but whoops, you're sleepy or you can't perform. Is that where you're going? Well, your Honor, that's the second argument we have to make here. Well, let's start with the first. What's the problem with the meds controlling the diagnosed disease? Well, two things. First of all, they don't. Second of all, by the very nature, they don't control it. I mean, the fact that they have to keep on being tapered and the very nature of this disease, as you gentlemen probably already know, is that people who have it don't believe they have a problem and are non-compliant. Well, that could go to many diseases and many medications. Almost, I'm old enough to know that all medications don't work. I think the fact that medications have to be changed in themselves, you're saying that that should be the basis of the care? I think what you're saying is that because the nature of bipolar disorder is that they are in denial, it's not that they neglect to take it, but the disease causes them to neglect to take it. That is correct, Your Honor. And there's some case law in that area. None of it was cited to this Court because I do believe that this is not a non-compliance case, although you see some of those arguments in the Commissioner's brief without suggesting that it's a non-compliance case. And the reason is, is because you can't blame a person who's bipolar for being non-compliant. It's the very nature of being bipolar that makes that person non-compliant. Well, that means that bipolar, per se, then, is a disability under the statute. Obviously, it's not, Your Honor. Obviously, it's not. But that's what you're telling me, because if the meds take care of the bipolar problem, and if the bipolar problem prevents them from taking the meds, all of a sudden we have a, per se, disability. That's not what I'm arguing, Your Honor. And I understand where the Court's going with that. I'm just asking you to explain that. If you look at the record here, and that's what we're dealing with, and you look at what the ALJ did, you have a record that's replete with examples of a person who is not functioning, not thinking clearly, can't get along with others, has a flight of ideas, difficulty concentrating. And those things keep on going on at a periodic time. The ALJ says, look at one chart note where the doctor says he's doing well. Well, a month before that, he was taken in by an ambulance, and because he was angry and hallucinating and screaming in the streets. That is not a person who can hold a gainful employment. And the record is replete with the fact that this person is struggling with bipolar disorder throughout the entire period of the disability claim. And what the ALJ has to do is to use specific and legitimate reasons why the treating physician's report, which suggests that this person cannot engage in gainful employment, is not correct. And I don't think he's done that. I think the four bases he gives are flimsy. And I think if this Court goes beyond that record, you know, then it's basically being inconsistent with its own decisions. It can't go beyond that record. It has to look at whether this ALJ's decision was appropriate, whether he gave specific and legitimate reasons. To the extent that the Commissioner goes beyond that record and looks throughout the record to scour the record for other bases, I think that's inappropriate. Now, with regard to the issue the Court raised, Your Honor, about medications, I think you're right. I think that the judge failed to take into account the disabling features of the medications themselves. And the record, again, is replete with examples. And I can give the Court some more, although I think they're in the record fairly well, that this person was suffering from the disabling effects of those medications. In fact, even the Commissioner's examiner, the State's examiner, so found, every single treating doctor that looked at this person found that he was suffering from the effects of the various medications. I think there were 18 in total that this gentleman was taking. And I think it was inappropriate for the ALJ not to give credence to those treating records in this case. And he didn't give a specific or credible reason why he didn't. If there aren't any other questions, I will reserve the rest of the time for rebuttal. Thank you, counsel. Good morning, Your Honors. Nancy Lyshevsky for the Commissioner of Social Security. In this case, Your Honor, the ALJ articulated multiple reasons for determining that while Mr. Lozano did have a severe mental impairment, he was capable of performing alternative work. And in this case, he provided well more than four reasons for explaining why he gave more weight to other evidence than Dr. Zabiga's limitation analysis. Well, you gave a lot of weight to Dr. Barnett's report over the treating physician. He did. Dr. Barnett wasn't really aware of the history, was he? He thought he'd been hospitalized in Mexico two years ago and had no problems since then. Well, I believe the gist of Dr. Barnett's report was that on medication, Mr. Lozano appeared to be stable, and he noted that there was a hospitalization in Mexico when Mr. Lozano was off his medication. But he thought that was just a simple episode and that there was no such history of this. Well, in this case, he saw Mr. Lozano in 2000, and then afterwards there were the Tulare County mental health records. But they all ñ in those cases, they showed that on medication, Mr. Lozano was stable. And the ALJ determined that he could perform alternative work on that basis. Is there evidence in this record of him having side effects from the bipolar medication? Yes, there are. And there was also evidence that, as the ALJ noted, when there were side effects, the doctors would readjust the medication to limit the side effects. There's multiple. What has that factored into his decision, the ALJ's decision, as to the kind of work he's capable of doing? Right. Well, he notes that on page 19 of his decision. And I believe that's one of the reasons that he limits the ñ Mr. Lozano to the simple repetitive tasks. In this case ñ I'm sorry. It's on page what? Page 19. There's ñ Nineteen of the record, you mean. Excuse me? Nineteen of the record. Nineteen of the ALJ's decision. Sorry. Well, the decision is only 17 pages long. I'm sorry. I'm looking at the base label. It would be page 2 of 7. Seven pages, yes. Now we're talking about the ñ Nineteen of the record. Okay. Or the excerpt. Sorry about that, Your Honor. The ñ if you're ñ there's a couple of 19s. There's a 19 numbering of what we have in our records. There's a 19 at the top of the page, and then there's a 19 at the bottom. Okay. Which one are we looking at? Both. I'm sorry, Your Honor. It's the 19 at the bottom of the page. I'm sorry. I think I assume ñ I assume this because that's the way we do it at work. I apologize. But 19, top of the page. Top of the page. Okay. And I believe that there was further discussion about side effects on page 22, also top of the page. And in this case, there's multiple ñ multiple references in the Tulare mental health records of Mr. Lozano running out of medication, having side effects, taking his medication at the wrong time, having side effects. The doctors who saw him on average twice a ñ excuse me, every two months would see him readjust the medication and send him ñ send him home. And in addition, I believe that the gist of Mr. Lozano's argument here is that the ALJ did not properly consider this treating physician opinion. And the Commissioner submits that he did in multiple ways. In addition ñ I'd like to get back to what I was asking. One of the reasons he didn't is because he relied on this report from Dr. Barnett. Dr. Barnett's diagnosis is a brief psychotic reaction. He didn't know there was any history of years of this bipolar problem. And his prognosis was guarded. There's always a possibility that he has a more serious underlying illness. However, though he currently has lack of symptoms, he has not been followed up psychiatrically. This makes the prognosis guarded. Well, he didn't know of all the prior hospitalizations, all the prior diagnoses, not of just a brief single episode, but of a bipolar condition with psychotic ramifications. Well, Your Honor, a couple of points. For one thing, the record also shows that Mr. Lozano appeared to work in various capacities in construction and as a rancher for more than a decade. So ñ Well, when did his condition become serious? Well, it seems like the first evidence in this record of any sort of bipolar disorder was 1999, I believe. When did he work as a rancher? Before that. So what's the relevance of that? The relevance is that even when he went into the Alameda County for this episode, there was a notation that he had received medications in Mexico for the last eight years and seemingly had been able to function until this time. That confused me. I take it that somehow he was working back and forth. He must have been in Mexico and the United States because it seems as though you're right. On page 19, top of the page, it talks about the fact that he had been receiving medications in Mexico prior to 1999. And I was having the same problem as Judge Reinhart determining the onset of this. So ñ onset, excuse me. So I assume that we have ñ if it's ñ according to you, and we look at 19, in 1999, he comes into Tulare ñ no. That was Alameda. Alameda. Yes. And he was a problem because meds that had been given to him in Mexico were somehow not working. I think he ran out. Well, okay. Yeah, he wanted refills. So is that where we look for the onset of this? Well, Your Honor, I think onset date is a complicated question in part because as a general, under our regulations, we look at onset date once there's a finding of disability. So then when's the onset date? In this case, it appears that the ñ Mr. Lozano, I believe his application said that he was ñ made the claim that he became disabled in ñ April 2000, hospitalized, age 19 again? Yeah. He was alleging it from 1998. 1998. Yes. So that's his alleged onset date. But we don't have any ñ I don't see any medical records from 1998. I think ñ yeah, I think he alleged disability since December 5th, 1998. And then the first medical records are from 1999, Alameda hospitalization. That's the first that we find out directly. And then we have a series, series of long transactions all related to medications. Basically, yes. It appears that for the most part, except for occasional group therapy, Mr. Lozano was controlled on medication, multiple medication visits approximately every two months. There was discussion, quite a bit of discussion, as I recall, about fatigue, his being fatigued and his suffering. Where does the ALJ specifically address that? Well, Your Honor, I believe that I direct you to 19. While he doesn't ñ Don't give me 19. I can't find 19. I got something that's ñ I have the 2003 decision. Okay, Your Honor. No problem. Okay, so that's on page 2. Okay. Page 2, bottom of the page. He's talking about how the record shows the adjustments of medication. Yes. And also on page 22. Where's he talking about fatigue? He doesn't talk about fatigue specifically in that case. Well, where does he? That's what I'm looking for. Okay. And then he also discusses, he discusses that there are side effects from medication. A fatigue. He does not discuss fatigue specifically. That's right. He doesn't. Right. Okay. So fatigue, a lot of talk about it. If I'm at work, if I were falling asleep up here, I think you'd probably think I wasn't doing my job. No. Right? Probably, Your Honor. Yeah. If you fell asleep, I think you weren't doing your job. I'd get in trouble, yeah. Yes. So don't ñ isn't that something that the ALJ should address? Well, Your Honor ñ Was it a ñ it's not a minor side effect. I mean, fatigue, that is one of the things they put on normal medications, if they ñ This drug may cause drowsiness or fatigue. Well, Your Honor, I think my argument in this case would be that while the ALJ never mentioned fatigue, he did mention side effects. The side effects that Mr. Lozano mentioned during the hearing ñ Where he had shaky hands and ñ With shaky hands. And he was fatigued. Okay. And the ALJ noted that these side effects weren't constant. And as far as the shaky hands, they were actually ñ Well, forget the shaky hands. Okay. I'm happy to. I'm very happy to. As far as with fatigue, as the district court noted when they upheld this decision, there was multiple references in the Tulare County mental health notations where they're just rebalancing plaintiff's medication, saying, like, he's taking it at the wrong time, we're going to make him take it at the right time, then he's fine. If he takes a ñ actually, there was a reference where ñ And those address the fatigue issue? Yes, they do. And in part because, for example, Mr. Lozano's claiming that he's fatigued and that he's sleepy all the time. And then one of the doctors, I believe it was Dr. Totomer, noted that he was confused about this because the claimant had come to him and said, I need a sleeping pill. So he's saying he's sleepy when he's getting a sleeping pill, which ñ And sleeping pills, they're actual ñ You know, it's funny. If I don't ñ if I can't sleep at night, I'm fatigued during the day. Well, in this case, what he was ñ seemed to be doing, what Dr. Totomer seemed to be suggesting was that the medications were working well, they were just not being taken at the right time. So he reduced the medication level. They went from, I believe, one trazodone to a quarter of a trazodone and said that seems to be working. And that then there was ñ there were not the side effects. Where does the ALJ analyze all of this? The ALJ's analysis is ñ He doesn't really address it. He addresses it in ñ By inference. There's definitely more detail in the district court's decision. All right. Thank you, counsel. We're over time. Thank you very much. You want to be brief? Can I ask you a quick question? Sure, sure. Just to clarify. I find nothing in the record that shows that he worked during this period. If the disability started, if you will, in 1999 through the date of the hearing, which I think was 2003, I don't find anywhere where it shows that he ever worked. To clarify, that's correct, Your Honor. But to clarify, the date of onset of disability was July 1st of 2000. That was the date that was included in the petition. The application was filed on the 26th of July of 2000. So even though he had symptoms and problems predating the date of onset of disability, it was July 1st of 2000 that was the date of onset of disability for these purposes. And there was no ñ no employment during that? No employment thereafter, and there's no evidence in the record of employment on that basis, Your Honor. And just to be clear, and I think the Court has seasoned on or seized on the point that the ALJ did not discuss the side effect of fatigue from the medications. And I think what you can find, just so you can feel comfortable with the fact that the record does support that finding, is that at AR 293, at 363 and 364, at 367, at 331, and at 369, each of the treating doctors found that Mr. Lozano was excessively fatigued as a result of his medications. The other side effects, which we see consistently are in January 11th of 2001, that he's still sleepy and irritable, notwithstanding the fact that he's controlled on the meds, that he experiences dizziness from Zyprexia and Restoril, that on ñ in May of 2001, that lithium makes him shaky, that in August of 2001, he is dopey and not doing well on Neurontin. I mean, we see these things consistently throughout the record, and ALJ does nothing to deal with the fact that they are debilitating, other than to say that they're not to be considered because they're not constant. Now, not only that, as from what I understand, correct me if I'm wrong on the record, he doesn't live alone. He lives with his father or his sister ñ His mother. His mother or sister. That's correct, Your Honor. So he's not sustaining himself. He's living with other people, I think. That is correct, Your Honor. And that was based upon his testimony, which is in the record as well, Your Honor. Thank you, counsel. Thank you, Your Honor. The case is adjourned. It will be submitted the next ñ
judges: Reinhardt, Brunetti, Fisher